UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CYNTHIA FAUSS-MILLER,

       Plaintiff,                      Case No. 06-12079

v.                                   District Judge Arthur J. Tarnow
                                       Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Cynthia B. Fauss brings this action under 42 U.S.C §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## PROCEDURAL HISTORY

On April 18, 2002, Plaintiff filed an application for Disability Insurance Benefits (DIB), alleging an onset date of October 6, 2001 (Tr. 120-123). After the Social Security Administration (SSA) denied benefits on September 18, 2002, she made a timely request for an administrative hearing, held on July 16, 2004 in Lansing, Michigan (Tr. 107, 417).

Administrative Law Judge (ALJ) Thomas Walters presided (Tr. 417). Plaintiff, represented by attorney Evan Zagora, testified, as did vocational expert ("VE") Heather Benton (Tr. 417-445). On October 28, 2004, ALJ Walters determined that Plaintiff was not disabled, determining that she could perform a significant number of jobs in the national economy. (Tr. 102). On June 16, 2005, the Appeals Council denied review (Tr. 5-6). Plaintiff filed for judicial review of the final decision on May 6, 2006.

## **BACKGROUND FACTS**

Plaintiff, born July 12, 1961, was age 43 when the ALJ issued his decision (Tr. 95). She has a high school education and worked previously as a truck driver, waitress, sales clerk, and book keeper (Tr. 95). She alleges disability as a result of soft tissue damage on her right arm (Tr. 135).

### A. Plaintiff's Testimony

Plaintiff testified that she resides in Fowlerville, MI (Tr. 419). Plaintiff stated that she has an associates degree in accounting from Pacific Coast College in San Diego (Tr. 419). Plaintiff indicated that she was not currently married and had six children: a 21-year old who was currently in the army, a 15-year old and six-year old that were currently living with her, and two 11-year olds and a 12-year old that had previously lived with their father but were presently living with her (Tr. 419-420).

Plaintiff testified that she had not worked since May of 2002, characterizing her part-time job at Russ Trucking as a work attempt following her injury (Tr. 420). She indicated that she worked as a truck driver from 1996 until the time of her 2001 injury,

adding that she had received a worker's compensation settlement (Tr. 420). In addition, Plaintiff stated that her 15-year old son receives Survivor Benefits (Tr. 420). She testified that she completed truck-driving school (Tr. 420-421). Plaintiff stated that she also worked as a waitress, retail sales clerk, and as a restaurant's bookkeeper (Tr. 421).

Plaintiff testified that following her injury, she went back to work, but due to setbacks, was forced to stop in March of 2002 (Tr. 421-422). She indicated that doctors did not diagnose Reflex Sympathetic Dystrophy (RSD) until approximately "October or November of 2002" when she complained of a burning pain that continued to get worse despite the doctor's efforts (Tr. 422). Plaintiff testified that after the accident she had pains in her neck and arm that she described as "mostly just a stiffness and . . . weakness" (Tr. 423). Around July of 2002 she began feeling a throbbing pain in her forearm, upper arm, across her shoulder, and up into her neck which progressively turned into a constant "burning, throbbing, tingling pain" even though her skin was cold to the touch (Tr. 423-425, 433). Plaintiff testified that doctors were not sure whether the pains in her shoulder and neck are part of the RSD or a myofascial strain (Tr. 424-425). Plaintiff reported limited improvement after the first and second of three nerve blocks, adding however that the third nerve block actually made her pain worse (Tr. 425-426).

Plaintiff claimed only minimal improvement after having gone through physical therapy (Tr. 426). She stated that she experienced short-term relief from Ultram, Penavel, and Topamax (Tr. 426-427). Plaintiff claimed her condition was exacerbated by weather changes (Tr. 427-428, 433). She testified that she experienced a constant pain, and her

discomfort would be increased by any movements, adding that even using her left arm for various tasks created discomfort (Tr. 428-429). She indicated that Ultram or over-the-counter Tylenol along with lying down helped her curb the headaches, but intense noises increased the pain (Tr. 430-431).

Plaintiff testified that she had muscle spasms in her neck, arms, legs, and back and had limited movement in her neck and head (Tr. 431-432). She claimed that the RSD also caused a less-intense burning pain in her right foot, under her right calf, and on top of her right thigh which seemed worse in the winter months (Tr. 432).

Plaintiff opined that she would be unable to work full time due to drowsiness caused by medication (Tr. 433). She claimed that she could not do anything for more than a half hour without taking at least a 15-minute break (Tr. 433). She reported that without medication she woke up about four or fives times a night, and when she did take medication, she woke up in the morning not feeling rested and with the same leg and arm pains as before she went to sleep (Tr. 434). Plaintiff stated that she only eats once a day, can never find a comfortable position to rest in, and during a typical eight hour day, spends about 3 hours lying down, occasionally falling asleep (Tr. 435). Plaintiff reported that she would not be able to sit or alternately sit or stand during an eight hour day without being able to lay down (Tr. 435). She alleged that burning leg and neck pain precluded her from standing more than ten to fifteen minutes (Tr. 435). Plaintiff testified that she could not walk even a quarter of a mile, lift a gallon of milk without either dropping it or feeling

more pain, use an adding machine, or hold on to a coffee cup without it dropping eventually (Tr. 435-437).

Plaintiff testified that she needed help with her finances, could not keep track of personal records, and began forgetting things, places, and people due to a closed head injury from the same accident (Tr. 437). She claimed that she used to have a photogenic memory but now must go back and reread a book six or seven times to remember (Tr. 437). Plaintiff reported depression, admitting that she had not yet sought treatment (Tr. 437-438). She testified that Dr. Aleveda and Dr. Shavare were her current doctors at the University of Michigan Neurology Center (Tr. 438). She continues to see Dr. Nisar, but no longer sees Dr. Naqua or Dr. Barker because she changed her insurance provider (Tr. 438).

Plaintiff testified that on a normal day she wakes up around eight, spends some time on the computer checking e-mails, does some mind games for about 15 minutes, picks up after the kids, rests, gets the kids up, and then helps them get their breakfast (Tr. 438-439). Plaintiff indicated that she gets help from her teenage son and her boyfriend in performing the housework, laundry, grocery shopping and cooking (Tr. 439). She testified that she does not go out to dinner or to the movies and only leaves her house to go to doctors' appointments, grocery shopping, to meet with a teacher at school, or to church approximately once a month (Tr. 440). Plaintiff indicated that she still had her driver's license and drove about twice a week (Tr. 440). Plaintiff reiterated that she did not believe that she was capable of full-time employment (Tr. 440).

**B.     Medical Evidence**

**i.     Treating Sources**

On August 31, 2001, Fazlolah Nickhah, M.D., noting that Plaintiff was injured the previous day, initially observed a cervical strain, abrasion of the neck, contusion and sprain of the right hand, abrasion of the right knee, and a strain in the right forearm (Tr. 232). He allowed Plaintiff to return to work with a limited use of her right hand (Tr. 236). Between August 31, 2001 and September 11, 2001, Plaintiff attended physical therapy sessions with Linda Briggs, P.T., showing minor improvements (Tr 220-238). Plaintiff returned to work on September 12, 2001, but over the next three weeks experienced increased pain in the right upper extremity (Tr. 202). On October 7, 2001, Dr Gauss M.D., prohibited Plaintiff from driving company vehicles (Tr. 226). On October 8, 2001, Joann Love, M.D., assessed Plaintiff's injuries as cervical radiculopathy, cervical strain, and interphalangeal joint sprain, referring Plaintiff to a hand surgeon, adding that she should also receive an MRI of her neck (Tr. 214). On October 10, 2001, Neuroradiologist Frank Seidelmann recorded a "[n]ormal MRI of the cervical spine" (Tr. 211-212). On October 15, 2001, Dr. Love modified Plaintiff's work restrictions to include no repetitive lifting over 10 pounds and amended her diagnosis as trapezius strain, cervicalgia, right upper arm strain, and finger contusion (Tr. 205-207). Plaintiff attended physical therapy sessions on October 16 and 17, 2001, where she continued to have pains in her neck and upper back (Tr. 203-204). On October 16, 2001, Consulting Physicians, P.C., recommended that Plaintiff avoid backing up cars, continuous driving, and excessive turning (Tr. 189).

On October 19, 2001, Aaron Sable, M.D., concluded that Plaintiff had a cervical strain, possible carpal tunnel syndrome (CTS) on the right, and a right long finger flexor tendon injury (Tr. 202). After evaluating Plaintiff on October 24, 2001, Richard Singer, M.D., opined that "[a]s far as her hand is concerned, I do not see why she could not drive a truck" (Tr. 241). EMG testing conducted on October 26, 2001 showed normal results. Plaintiff reported no improvement from physical therapy conducted at the end of the same month with an emphasis on cervical traction (Tr. 192-202). In a report dated November 5, 2001, Dr. Singer noted that after reviewing the EMG and nerve conduction study, he could not "find any anatomic reason for her complaints at [that] point" (Tr. 240). On November 6, 2001, Phillip Mayer, M.D., reported that Plaintiff "has no objective abnormalities on examination which require [his] treatment" (Tr. 242-243).

In November, 2001, Plaintiff sought the services of Bradford Barker, M.D., who prescribed Motrin (600 mg) and Flexeril (10 mg) (Tr. 303, 316). On November 14, 2001, he diagnosed Plaintiff with a severe myofascial strain injury to the neck and right upper extremity, recommending at least two months of physical therapy "consisting of heat, ultrasound, myofascial release and massage" (Tr. 301-302, 311-316). Mary Ann Koenig, P.T., reported on November 14, 2001, that it would take the Plaintiff "a longer period of time to recover due to involvement of multiple areas and the physical requirements needed to perform her regular job" (Tr 309). Koenig opined that "it is possible she would be able to return to work earlier on a restricted basis if a position would be available for her" (Tr. 303-310). Under Koenig's supervision, Plaintiff underwent 11 physical therapy sessions

between November 15, 2001 and December 6, 2001, over which time she experienced decreased levels of pain in all areas and an increase in her range of motion (Tr. 292-299). On December 7, 2001, Dr Barker reported that Plaintiff no longer dropped items (Tr. 290). After 14 more physical therapy sessions between December 10, 2001 and January 3, 2002, Plaintiff reported significant improvement, although expressing concern that if she returned to work "too soon" the elbow would "act up again" (Tr. 283-289). Koenig recommended that Plaintiff be discharged from treatment for the cervical strain, continue exercises at the shoulder and wrist, and continue full treatment at the elbow (Tr. 285).

Imaging studies of Plaintiff's right elbow done on January 4, 2002 showed no fracture or dislocation, only "mild degenerative lipping" (Tr. 280). On January 24, 2002, tests showed "normal double contract CT arthrogram of the right elbow" and "normal double contract arthrogram of the right elbow" (Tr. 274-276). The next day, Plaintiff reported her pain as "8/10" (Tr. 273). Between January 7, 2002 and January 25, 2002, Plaintiff attended 10 more physical therapy sessions, reporting that "her pain level decreased to a 5/10 prior to having the ultrasound," at which time her pain level rose significantly and was "intolerant to exercises at the elbow" (Tr. 271-273, 277-278). On January 29, 2002, Dr. Barker allowed Plaintiff to return to work on February 5, 2002 for 25 hours per week (Tr. 265). After another seven sessions of physical therapy between January 28, 2002 and February 18, 2002, Koenig noted an "exacerbation" in Plaintiff's pain since her return to work, and that Plaintiff slightly regressed in her range of motion (Tr. 266-267). Dr. Barker prescribed elastic wrist braces and elbow sleeves on February

20, 2002 (Tr. 265). Plaintiff only attended two physical therapy sessions and was working 25-35 hours per week as a truck driver between her Feb 20, 2002 and April 1, 2002 visits, but she was on a home exercise program that she regularly followed (Tr. 255). Dr. Barker reported that Plaintiff's right arm began swelling due to lack of exercise and recommended that Plaintiff reduce her work hours to 25 hours per week of office-only duties until May 31, 2002 (Tr. 255). Plaintiff did not work between her April 1, 2002 visit and her April 29, 2002 visits, and complained of more pain in her right elbow and wrist (Tr. 254). On April 29, 2002, Dr. Barker noted that Plaintiff was not going to physical therapy sessions because worker's compensation refused to pay (Tr. 254). On her August 22, 2002 visit with Dr. Barker, Plaintiff reported "muscle twitching" in her back, right leg, and left arm (Tr. 248).

On September 6, 2002, Elizabeth W. Edmond, M.D., noted a history of scoliosis, mild arthritis of the right knee, adhesive capsulitis in the right shoulder, a history of Raynaud's phenomenon, possible reflex sympathetic dystrophy superimposed, and she ruled out local pathology of T8-T10 (Tr. 330). Dr. Edmond further noted that Plaintiff had limited use of her right upper extremity, which is her dominant extremity, adding that she could write, button clothing, pick up a coin on occasion, and possibly open a jar with her left hand if she could stabilize it with her right (Tr. 330).

Between January 24, 2003 and May 10, 2004, Plaintiff was seen by Nilofer Nisar, M.D., who, after an initial neurological examination opined that Plaintiff likely had a "severe degree of cervical radiculopathy causing limitation of movements and sensory and

motor problems, as well as . . . [a] significant degree of myofacial pain syndrom, status-post trauma," (Tr. 380). He further stated that her "[c]ognitive difficulties could be secondary to traumatic brain injury" (Tr. 380). The results of an EEG test, performed on January 31, 2003, were described as "mildly abnormal" (Tr. 382). In a letter to Dr. Barker on February 7, 2003, Dr. Nisar stated that there was a remote possibility that Plaintiff could suffer from Multiple Sclerosis (Tr. 384-385). Dr. Nisar opined that Plaintiff could not perform sedentary or light work on a sustained basis, adding that she could only sit, stand, or walk for less than one hour in an eight-hour work day because she needed to lie down or rest for substantial periods of time during the day to relieve pain and fatigue arising form her medical impairments (Tr. 369-376).

Between the dates of March 6, 2003 and April 3, 2003, Plaintiff attended twelve physical therapy treatments for neck and shoulder strengthening, after which physical therapist Gary France reported "little progress with regard to further improvements" of Plaintiff's symptoms, adding that further physical therapy sessions would be of little use (Tr. 345-355). On May 9, 2003, Tonya Coats, M.D., diagnosed Plaintiff with complex regional pain syndrome (reflex sympathetic dystrophy of the right upper extremity) and myofascial pain of the upper back and neck area (Tr. 356-358).

On March 1, 2004, Mark Ealovega, M.D., diagnosed Plaintiff with Raynaud's phenomena, a closed head injury, and reflex sympathetic dystrophy (Tr. 393-395). On April 30, 2004, Dr. Srinivas Chirauvuri opined that Plaintiff suffered from "mysofascial and mechanical pain of the right neck and right shoulder with a component of neuropathic

pain in the right upper extermity," suggesting doctors perform a right-sided stellate ganglion block under fluoroscopic guidance (Tr. 389-392). On May 12, 2004 resident surgeon Cain Dimon, M.D., under the guidance of Eugene Mitchell, M.D., performed that procedure, after which Plaintiff's verbal analog scale pain score dropped from "approximately 8-9/10 to 2/10 on the verbal analog scale prior to discharge" (Tr. 409-413). After treatment from the Interventional Pain Center, Dr. Ealovega increased Neurontin to 200 mg twice daily for that week and 300 mg three times a day for the following week (Tr. 387). Dr. Ealovega recommended that Plaintiff continue with Ultram 50 mg three times a day or as necessary (Tr. 387). On April 27, 2004, Multidisciplinary Pain Center conducted an initial evaluation for physical therapy (Tr. 403-408).

  ii.  **Consultive and Non-Examining Sources**

On January 28, 2002, an evaluation performed by Dr. William S. Gonte noted that upon examination, Plaintiff "has no objective evidence of cervical radiculopathy" (Tr. 246). Furthermore, the report points out that Plaintiff "has no objective evidence of ongoing pathology or any residual from the alleged incident of August 30, 2001" (Tr. 246). The report stated that "she requires no further diagnostic testing or treatment," and can "return to work activities without restrictions," adding that "[h]er long term prognosis is excellent" (Tr. 246).

On August 31, 2002, a physician hired on behalf of the SSA performed a Physical Residual Functional Capacity Assessment of Plaintiff's condition on the basis of treating records (Tr. 319-326). The report found that Plaintiff retained the ability to lift 20 pounds

occasionally, and 10 pounds frequently, along with the ability to sit, stand, or walk for approximately six hours in an eight-hour workday (Tr. 320). Within the above-stated exertional range, Plaintiff was deemed to retain the unlimited ability to push or pull (Tr. 320). The report further deemed Plaintiff capable of frequent ramp and stair climbing but advised against any ladder, rope, or scaffold climbing (Tr. 321). Plaintiff's manipulative restrictions included limitations on the ability to reach with her right hand (Tr. 322). The report found the absence of visual and communicative limitations, and further found no environmental limitations except the avoidance of even moderate exposure to vibration (Tr. 322-323). The assessment concluded by stating that Plaintiff's allegations were "only partially credible," noting that "[i]f she couldn't do any lifting she would not be able to dress herself, bathe, or make the small meals she does daily as she would not be able to lift food, small pans, her clothing and towels to dry herself off after a bath" (Tr. 325).

### C.     Vocational Expert Testimony

VE Heather Benton classified Plaintiff's past relevant work as a tractor trailer/truck driver as semi-skilled at the medium level of exertion; waitress as semi-skilled at the light level of exertion; sales attendant as unskilled at the light level of exertion; and bookkeeper as skilled at the sedentary level of exertion (Tr. 442).

The ALJ then posed the following hypothetical question:

Let me ask you to assume that a person the same age, education and vocational experience as the claimant, who as a result of her condition has a residual functional capacity for a range of light or unskilled in nature with no working around hazards, such as moving machinery or unprotected heights, in a low stress entry level environment. The right arm would be only used to assist the left in

terms of performing this job. There would be no lifting with the right arm. No gripping or grasping with the right arm. Given those criteria, would there be a light unskilled essentially one-handed job such a person could do?

(Tr. 442). The VE found that the limitation of using only one hand diminished the number of jobs that Plaintiff could perform (Tr. 442-443). She determined that Plaintiff could nonetheless perform a number of jobs existing in the lower peninsula of Michigan including the work of an inspector (3,000 jobs), server (800), and information clerk (900) (Tr. 442-443). She stated that if the Plaintiff's testimony were considered fully credible, the Plaintiff could not perform the jobs provided (Tr. 443). Finally, the VE declared that her testimony was consistent with the Dictionary of Occupational Titles (DOT) (Tr. 443).

### D. The ALJ's Decision

On October 28, 2004, ALJ Walters found the severe impairments of "reflex sympathetic dystrophy of the right upper extremity, headaches, myofascial pain/fibromyalgia, and history of Raynaud's phenomenon" (Tr. 101). He determined that although Plaintiff experienced severe impairments based on the requirements of 20 C.F.R. §404.1521, they neither met nor equaled any impairment listed in Part 404 Appendix 1 Subpart P, Regulation No. 4 (Tr. 101).

The ALJ concluded that Plaintiff was unable to perform any of her past relevant work as a truck driver, waitress, sales clerk, or book keeper (Tr. 102). However, the ALJ found that Plaintiff retained "a residual functional capacity ("RFC") for a range of light work" (Tr. 100). Adopting the VE's job findings, the ALJ concluded that Plaintiff could

perform unskilled, light work as an inspector, sorter, or information clerk (4,700 jobs) (Tr. 101-102).

ALJ Walters found Plaintiff's allegations of limitations "to be somewhat overstated and inconsistent with the available evidence," noting that imaging studies did not support Plaintiff's allegations (Tr. 99). Despite her allegations of depression, Plaintiff "did not participate in ongoing counseling of psychotherapeutic modalities" (Tr. 100).

## ARGUMENT

### A. Credibility

Plaintiff argues that the ALJ's credibility findings were not well supported as he did not consider all of Plaintiff's symptoms in determining her functional capacities. Plaintiff, citing Social Security Ruling 03-2p, argues that RSD, combined with myofascial pain syndrome, could reasonably cause her symptoms. *Plaintiff's Brief* at 14.

As a general rule, the courts cede enormous latitude to the ALJ's credibility determinations. *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1234 (6th Cir. 1993); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). An ALJ's credibility determination is guided by SSR 96-7p, which further describes a two-step process for evaluating symptoms. *See Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). "First the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment . . . that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id*. Second, SSR 96-7p mandates that:

once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limited effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

*Id*.

Record evidence amply supports the ALJ's credibility determination. Notwithstanding Plaintiff's argument that the various tests including MRI, CT, and EEG are "irrelevant to a diagnosis of RSD," the ALJ properly considered all evidence of record, including clinical findings as well as Plaintiff's subjective allegations and ability to perform daily activities, in assessing the functional impact of Plaintiff's RSD (Tr. 99). Likewise, clinical records show that Plaintiff ambulates well without an assistive device and has a functional range of motion (Tr. 99). Furthermore, the ALJ noted that while Plaintiff "has long standing difficulties with her right upper extremity and neck," she "retains generally good function of her left upper and bilateral lower extremities, and spine," noting further that Plaintiff's neurological functions in terms of motor power, reflex activity and sensation were largely preserved (Tr. 99). The ALJ also considered that Plaintiff's musculoskeletal and extremity reviews were free of clubbing, cyanosis, ulceration, or diminished pulsation (Tr. 99).

Physicians who evaluated Plaintiff did not agree as to the degree to which Plaintiff was limited by her pain (Tr. 246, 330, 372-373, 410). Dr Nisar, a non board-certified

neurologist, was the only evaluating physician who believed that Plaintiff could not perform even light or sedentary work (Tr. 372-373). Dr. Edmond reported that Plaintiff had limited use of her right upper extremity, yet could write, button clothing, pick up a coin on occasion, and possibly open a jar with her left hand if she could stabilize it with her right (Tr. 330). On May 12, 2004 resident surgeon Dr. Dimon, under the guidance of Dr. Mitchell, reported that Plaintiff's verbal analog scale pain score dropped from "approximately 8-9/10 to 2/10 on the verbal analog scale prior to discharge" (Tr. 410). Furthermore, in an independent medical evaluation on January 28, 2002, Dr. Gonte reported that Plaintiff was able to "return to work activities without restrictions," noting that "[h]er long term prognosis is excellent" (Tr. 246). Plaintiff's medical records provide substantial support for the ALJ's decision.

"The regulations indicate that if a disabling severity cannot be shown by objective medical evidence alone, the Commissioner may also consider other factors, such as how the claimant's symptoms affect [her] daily activities. . ." *Brown v. Commissioner of Social Sec.*, No. 99-2165, 2001 WL 45230, at *5 (6th Cir. 2001); *see also* 20 C.F.R. §404.1529(c)(3). Plaintiff argues that the ALJ did not discuss the subjective reports of her daily activities. However, the record supports the ALJ's finding that Plaintiff's daily activities were inconsistent with her allegations of constant disabling pain (Tr. 100). Plaintiff testified that she still drove twice a week, took care of light housework, did laundry with assistance, and went grocery shopping with assistance (Tr 100, 439-440). Although Plaintiff alleged she often felt groggy and had difficulty with focus and memory,

evaluators commonly described her as "alert, correctly oriented, responsive and appropriate," contradicting her "expressed need to lie down for several hours each day, and to take breaks every ½ hour when performing tasks" (Tr. 99, 357, 391). Despite Plaintiff's complaints of a depressed mood, she did not participate in ongoing counseling or psychotherapeutic modalities (Tr. 100, 437-438).

In short, substantial evidence supports the ALJ's finding of credibility and his assessment of pain.

### B. Treating Physician

Plaintiff further argues that the ALJ erred in failing to accord significant weight to the opinion of Plaintiff's treating physician, Dr. Nisar, who believed that Plaintiff could not perform even light or sedentary work. Plaintiff claims, under Social Security Ruling 03-2p and *Preston v. Secretary of Health and Human Services*, 854 F.2d 815, 819-820 (6th Cir. 1988), that since there is no reasonable basis for rejecting the opinion of the treating physician, the ALJ's residual functional capacity (RFC) finding is inaccurate.

In *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (footnote 7) (6th Cir. 1991) the court held that "it is well-settled in this circuit that treating physicians' opinions, based on objective evidence, should be accorded significant weight. If uncontradicted, the physicians' opinions are entitled to complete deference." In *Wilson v. Commissioner of Social Sec*. 378 F. 3d 541, 544 (6th Cir. 2004) the court stated:

> If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors–namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

supportability of the opinion with the record as a whole, and the specialization of the treating source–in determining what weight to give the opinion.

Further, the "ALJ must 'give good reasons' for not giving weight to a treating physician in the context of a disability determination." *Id.*; 20 C.F.R. §404.1527(d)(2) (2004).

The ALJ's decision contains a sufficiently thorough analysis of Dr. Nisar's opinion and provides ample reasons for declining to give it controlling weight (Tr. 100). The ALJ noted that despite Dr. Nisar's diagnosis of severe pain syndrome secondary to spine disease, his office notes "indicated that diagnostic evaluations showed no meaningful pathology related to the claimant's spine" (Tr. 100). The ALJ found that the record did not support Dr. Nisar's opinion, adding that his opinions were "contraindicated by other evidence in the record, not the least of which are various relatively benign objective studies ordered by the doctor" (Tr. 100).

There is little doubt that Dr. Nisar's status is that of a treating physician, having treated Plaintiff seven times in a 14-month period. However, because his opinions are not supported by objective clinical data and are contradicted by other evidence in the record, they are accorded minimal weight (Tr. 100). Plaintiff is correct in pointing out, under *Harris v. Heckler*, 756 F.2d 431 (6th Cir 1985), that "[i]f uncontradicted, the physician's opinion is entitled to complete deference." *Plaintiff's Brief* at 18. However, substantial evidence in the record negates Dr. Nisar's view, minimizing the weight given to his opinion. *See* 20 C.F.R. §404.1527(d); *Hardaway v. Secretary of Health and Human*

*Services*, 823 F.2d 922, 927 (6th Cir. 1987). Dr. Nisar opined that Plaintiff could never lift up to five pounds, yet Plaintiff testified that she cooks, does laundry, and goes grocery shopping with the help of her 16-year old son (Tr. 375, 439). Similarly, the imaging studies, "which do not uncover totally debilitating pathology," contradict Dr. Nisar's conclusory opinion that Plaintiff cannot perform light or sedentary work on a sustained basis (Tr. 99, 373). "The ALJ . . .is not bound by a conclusory statement of the treating physician regarding the claimant's disability, particularly when the statement lacks medical support." *Durrette v. Commissioner of Social Sec.*, No. 94-3734, 1995 WL 478723, at *3 (6th Cir. 1995); *see also King v. Heckler,* 742 F.2d 968, 973 (6th Cir. 1984); *Halsey v. Richardson,* 441 F.2d 1230, 1235 (6th Cir. 1971). Thus, pursuant to *Wilson, supra,* the ALJ properly weighed the opinion of Plaintiff's treating physician Dr. Nisar.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgement be GRANTED and that Plaintiff's Motion for Summary Judgement be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with

specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: July 11, 2007

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 11, 2007.

S/Gina Wilson
Judicial Assistant